UNITED STATE DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| VICKY PHILIPS-CHIZ, Personal Representative of the Estate of Stanley Chiz, | ) ) ) | Civil Action No.: |
| | ) | |
|      Plaintiffs, | ) | |
| | ) | |
| v. | ) | COMPLAINT AND |
| | ) | JURY TRIAL DEMAND |
| BENNET WALSH, | ) | |
| DAVID CLINTON, | ) | |
| VANESSA LAUZIERRE, | ) | |
| CELESTE SURRERIA, | ) | |
| | ) | |
|     and | ) | |
| | ) | |
| FRANSCISCO URENA, | ) | |
| | ) | |
|     Defendants. | ) | |

INTRODUCTION

1.     The Soldiers' Home in Holyoke, Massachusetts ("Soldiers' Home"), is a multifaceted health care facility available to eligible Veterans of the Commonwealth of Massachusetts. The Commonwealth of Massachusetts advertises the Soldiers' Home as their mission to provide "'Care with Honor and Dignity' in the best possible health care environment for eligible veterans who reside in the Commonwealth of Massachusetts." However, that could not be further from the scene described by social workers and health care professionals working in the Soldiers' Home during March of 2020. The five defendants named in this lawsuit were responsible for ensuring the Veterans residing at the Soldiers' Home received appropriate care. Instead, they demonstrated a lack of consciousness as they treated the Veterans in a manner that deprived them of their basic rights, needs, and dignities. As a result of the defendants' actions and lack thereof, 76 veterans were caused to die preventable deaths from COVID-19, including Stanley Chiz. An additional 84 veterans

1

were exposed and infected to the fatal COVID-19 virus, suffering personal harm and injuries. Each one of the five defendants acted with deliberate indifference to the risks and harm posed by the COVID-19 pandemic, causing the rapid spread of COVID-19 throughout the Soldiers' Home, endangering the lives of veterans and staff.

2.      This is a civil rights action for damages pursuant to the Fourteenth Amendment and 42 U.S.C. §1983 by Vicky Philips-Chiz, the Personal Representative of Estate of Stanley Chiz ("Estate"). Stanley Chiz was a veteran who died in April 17, 2020, as a result of contracting COVID-19 during the COVID-19 outbreak at the Soldiers' Home. This claim seeks to redress the deprivation of life of Stanley Chiz, a veteran citizen, under the color of law, that resulted as a denial of reasonable medical care, treatment, and safety while in the care of the Soldiers' Home.

3.      The five defendants named in this case acted individually and collectively as part of the leadership team at the Soldiers' Home with deliberate indifference to the risks posed by the COVID-19 pandemic and in their manner of treatment of the Veterans residing at the Soldiers' Home during such pandemic, by failing to prevent the spread of COVID-19 and administer proper precautions, protocol, and care to the Veterans at the Soldiers' Home.

4.      An independent investigation commissioned by the Governor of the Commonwealth of Massachusetts specifically recounts the unprofessional, unethical, and deliberately indifferent behavior of the five individuals, the same defendants within this case, named and responsible for the care of the veterans at the Soldiers' Home. The investigation report, "The COVID-19 Outbreak at the Soldiers' Home in Holyoke: An Independent Investigation Conducted for the Governor of Massachusetts" ("Report"), attached as Exhibit 1, examines not only the grievous and erroneous actions of the leadership team at the Soldiers' Home amidst the COVID-19 pandemic, but also extends further to identify the Department of Veterans' Services failure to address the substantial and long-standing concerns regarding the leadership of the Soldiers' Home, specifically, Superintendent Bennett Walsh.

2

PARTIES

5.    The plaintiff, Vicky Philips-Chiz, is the personal representative of the Estate of Stanley Chiz. See Hampden County Probate Court Docket No.: HD20P1646EA.

6.    The defendant, Bennett Walsh, is the former Superintendent of the Soldiers' Home in Holyoke, Massachusetts, and he currently resides in Massachusetts.

7.    The defendant, Dr. David Clinton, is the former Medical Director of the Soldiers' Home in Holyoke, Massachusetts, and he currently resides in Massachusetts.

8.    The defendant, Vanessa Lauziere, is the former Chief Nursing Officer of the Soldiers' Home in Holyoke, Massachusetts, and she currently resides in Massachusetts.

9.    The defendant, Celeste Surreira, is the former Assistant Director of Nursing of the Soldiers' Home in Holyoke, Massachusetts, and she currently resides in Massachusetts.

10.   The defendant, Francisco Urena, is the former Massachusetts Secretary of Veterans' Affairs, and he currently resides in Massachusetts.


JURISDICTION AND VENUE

11.   This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because the claims arise under the Law of the United States, specifically the Fourteenth Amendment to the United States Constitution and 42 U.S.C.  §1983.

12.   This Court has supplemental jurisdiction over any state law claims plaintiffs might bring pursuant to 28 U.S.C. §1367(a).

13.   This Court has personal jurisdiction over the defendants because they each reside in Massachusetts, and during all times relevant, they worked in Massachusetts where the cause of action underlying the Complaint occurred.

14.   Venue is proper in the Western Division of this Court because all parties reside in either Hampshire County or Hampden County, excluding Secretary Urena who resides in another county within Massachusetts.

FACTUAL BACKGROUND

   A.  Background Regarding the soldiers' Home in Holyoke

 15. The Soldiers' Home located in Holyoke, Massachusetts was established by statute in 1946 and is governed by G.L. c. 6, §§ 17, 70, and 71.

3

16. Chapter 70, § 71 creates a seven-member Board of Trustees, comprised of residents of Berkshire, Franklin, Hampden, and Hampshire counties located within Massachusetts. Its members are appointed by the Governor.

17. Chapter 70, § 71 grants authority to the Board of Trustees to manage and control the Soldiers' Home in Holyoke, MA, and all property, real and personal, of the Commonwealth that is occupied or used by the home.

18. Chapter 70, § 71 grants authority to the Board of Trustees to appoint a superintendent. The Superintendent serves as "administrative head of the home" and "shall appoint and may remove a medical director, a treasurer, and an assistant treasurer", subject to the approval of the Board of Trustees.

19. On April 29, 2016, the defendant, Bennett Walsh, was appointed Superintendent of the Soldiers' Home.

20. Mr. Walsh served as the Superintendent of the Soldiers' Home in Holyoke, MA until March 30, 2020.

21. Chapter 70, §71 provides that the "medical director shall have responsibility for the medical, surgical and outpatient facilities and shall make recommendations to the superintendent regarding the appointments of all physicians, nurses, and other medical staff."

22. Dr. David Clinton served as Medical Director of the Soldiers' home during the relevant events set forth in this Complaint.

B. Inadequate Leadership Appointment

Superintendent Walsh:

23. The leadership team of the Soldiers' Home, specifically appointment of Superintendent Bennett Walsh, is well documented as to be insufficient and substantially deviated from professional standards.

24. Mr. Walsh's lack of experience and expertise in the department of healthcare and health care administration was well known prior to the COVID-19 pandemic.

25. The Assistant Director of Nursing referenced Mr. Walsh's lack of healthcare experience by providing examples of common terms that she had to explain to Mr. Walsh including productivity standards, FTEs (full-time equivalents), CMS (Center for Medicare and Medicaid Services), and the Joint Commission. Report at 38.

26. John Crotty was appointed to role of Deputy Superintendent of the Soldiers' Home in 2016. Mr. Crotty had experience as a licensed nursing-home administrator. Staff described Mr. Crotty as "fantastic," "old school," "transparent," and that "he knew what he was doing." Report at 43.

   Secretary Urena.

27. Secretary Urena and Chief of Staff Paul Moran shared similar concerns about Mr. Walsh's ability to perform his position. During the COVID-19 outbreak at the Soldiers' Home, Mr. Moran expressed concern to Secretary Urena that "Mr. Walsh's communication skills are not good and he is never thorough or forthright in his communication." Secretary Urena agreed with this assessment and explained that "everything [Mr. Walsh sent] over for years was cryptic." Report at 38.

28. The Report additionally noted that the high rate of staff turnover under Mr. Walsh's leadership was a red flag and "if one more employee had quit [under Walsh's management], there would be a more serious conversation that had to happen with him." Report at 38 and 39.

29. Secretary of Health and Human Resources Marylou Sudders instructed Secretary Urena to ensure the Soldiers' Home had a Deputy Superintendent with Healthcare experience. Report at 43.

30. Mr. Walsh's interests were not in the best interests of the Soldiers' Home and providing care to the veteran residents. Secretary Urena emphasized that it was important for the Deputy Superintendent "to have a medical background and [be] licensed as an expert" but "Walsh was not interested in that." Report at 44.

31. Secretary Urena demonstrated his clear knowledge of Mr. Walsh's lack of qualifications for the position, and yet allowed for him to remain despite glaring concerns. Secretary Urena stated while searching for a new Deputy Superintendent in 2019 that he sought a candidate who was a licensed nursing home administrator because "Walsh did not come from a medical background." This Report at 43.

32. The Report illustrates as demonstrated through the above-captioned lines 24-30, that Superintendent Walsh was not qualified for the position of Superintendent nor capable of performing its responsibilities, which resulted in the disarray of the Soldiers' Home amidst a pandemic. However, he remained in that position and was not placed on administrative leave until March 30, 2020 when a response team organized by Secretary Sudders, Acting Secretary Tsai, and Undersecretary Mich arrived at the Soldiers' Home to assist with the situation. This is due to Secretary Urena's actions, and lack thereof, to exercise professional judgment in the maintenance of the Soldiers' Home and its Veteran Residents. Report at 110.

Medical Director Dr. David Clinton:

33. Several members of the leadership team expressed concerns about Dr. Clinton's performance in his role as Medical Director. Report at 42.

34. Chief Nursing Officer, Ms. Lauziere, stated that she would have expected the Medical Director to be at the facility full-time and to be "more available." However, Dr. Clinton's hours consisted of 20-hours per week with compensation of $116,000. Report at 42.

35. Ms. Lauziere also indicated that she "was not really impressed with Dr. Clinton's practice—or lack of it—as a Medical Director" and that in her view, he did not spend enough time "getting into the detail of care." Report at 42.

36. Val Liptak, an experienced healthcare executive appointed as the Interim Administrator of the Solders' Home after Mr. Walsh's suspension, observed that Mr. Clinton is "not a strong physician to lead the organization especially if they are going to get their medical records up to snuff." Report at 42.

37. Upon arrival to the Soldiers' Home, it was noted by Ms. Liptak that the facility did not have an accurate list of health care directives and healthcare proxies for each veteran. Additionally, it was noted that Dr. Clinton knew only the patients that were located on his floor and was not familiar with majority of the veterans in the facility. Report at 42 and 43.

38. Dr. Clinton was inquired by Lisa Colombo, the Executive Vice Chancellor of Commonwealth Medicine, and a member of Ms. Liptak's responsive team, as to why he was not visiting the floors of the facility and evaluating the veterans. His response was that he was at "high risk" for COVID-19 and that he "did not want to go on the floors." Report at 43.

39. On the contrary, Mr. Walsh's impression of Dr. Clinton as Medical Director was positive and emphasized that "in four years I never overrode a decision made by Dr. Clinton," which reveals that the leadership team was composed of individuals who either lacked ability or experience to properly evaluate its staff or chose to ignore evident issues in management.

40. On March 27, 2020, Dr. Clinton failed to use his authoritative power as Medical Director of the Soldiers' Home to prohibit the integrating of the two dementia units, despite being aware of the detriment this move would pose to the Home.

41. The report demonstrates that the management and leadership team of the Soldiers' Home was inadequate and consisted of appointed professionals that failed to perform their position responsibilities in a crisis that would require healthcare administration experience and medical professionals willing to deliver healthcare standards care to Veterans and residents, neither which were conducted at the Soldiers' Home.

6

C. COVID-19 Regulations Proposed by State and Federal Agencies

42. In December of 2019, SARS-COV-2, also referred to as COVID-19, was first identified in China and has since spread worldwide, evolving into a pandemic that is ongoing.

43. The first COVID-19 case in the Commonwealth was confirmed on February 1, 2020, and was determined to have arrived earlier

44. In early February 2020, the Commonwealth of Massachusetts and the United States government began introducing instructions, guidance, literature, and recommendations directed at protecting citizens from COVID-19. Report at 57.

45. Among the proposed preventative measures, included directions targeted towards institutions involving healthcare facilities in order to isolate suspected cases of COVID-19 and prevent contamination.

46. Early in February 2020, the Department of Health released a "fact sheet" for long-term care facilities which stated on how to prevent the spread of infectious agents. Report at 58.

47. On February 21, 2020, the CDC released a preparedness checklist aimed at healthcare professionals, detailing procedures that should be in place to prepare for the arrival of patients with confirmed or possible COVID-19. The procedures included reviewing a facility's infection-control procedures for visitor management and restriction, the usage of personal protective equipment for healthcare workers and patients, and ensuring proper patient placement in light of an infectious disease breakout. Report at 58.

48. On March 2, 2020, Leslie Darcy, EOHHS Chief of Staff, sent an email to a variety of agency officials, including Mr. Walsh, regarding the Commonwealth's preparations for a potential outbreak of COVID-19. Report at 60.

49. On March 6, 2020, Elvira Loncto, a federal VA employee, distributed COVID-19 guidance to Mr. Walsh and other personnel advising the limiting of staff movements between COVID-19 contaminated and unaffected areas, including the screening and limiting of visitors, assessing residents daily for symptoms, developing an isolation plan for suspected cases, and encouraging social distancing. Report at 60.

50. On March 10, 2020 Governor Baker declared a State of emergency in the Commonwealth. That same day, the VA issued a press conference outlining precautions to be taken at all VA facilities, including (i) prohibiting visitors; (ii) suspending new admissions; and (iii) actively screening staff for COVID-19. Report at 60.

51. On March 12, 2020, Paul Moran (Department of Veterans' Services Chief of Staff) forwarded an email to Mr. Walsh containing COVID-19 guidance for assisted-living

facilities among other community care programs. The guidance directed facilities to isolate symptomatic individuals, specifically advising assisted-living facilities to move symptomatic residents to a single-person unit with the door closed. Report at 61.

52. On March 12, 2020, the CDC released guidance detailing "what healthcare personnel should know about caring for patients with confirmed or possible" cases of COVID-19. Among the guidance was recommendation to isolate suspected COVID-19 patients and instructions including "placing a facemask on the patient and placing them in an examination room with the door closed in an Airborne Infection Isolation Room (AIIR), if available." Report at 61 and 62.

53. On March 16, 2020, the Department of Heath issued another policy memorandum focused on long-term care facilities. The memorandum consisted of guidance regarding visitation, social gatherings and activities, healthcare personnel protection equipment, and protocol for screening for symptoms of COVID-19. This memorandum replaced the previous long-term care facility guidance issued on March 11, 2020. Report at 62.

54. On March 17, 2020 through March 23, 2020, the Department of Public Heath continuously issued orders and guidance pertaining to persona protective equipment for clinical staff and health care professionals including how facilities could request personal protective equipment. Report at 62.

55. On April 5, 2020, the CDC published a detailed guidance on preparing nursing home facilities for COVID-19 in addition to a detailed interim infection control and preventative measures for confirmed cases. Report at 63.

56. As the COVID-19 pandemic continued to evolve and more information was discovered regarding the disease, the CDC and Department of Heath released updated guidance and precautionary measures to take in order to prevent the spread of the COVID-19.

D. Soldiers' Home Lack of Preparation Fails to Prevent COVID-19 Spread

57. In early March the Soldiers' Home leadership team consisting of the defendants, Bennet Walsh (Superintendent), David Clinton (Medical Director), Vanessa Lauziere (Chief Nursing Officer), and Celeste Surreira (Assistant Director of Nursing), met to discuss measures and precautionary initiatives to prevent to the introduction and spread of COVID-19 at the facility. Report at 64.

58. On March 5, 2020, Infectious Disease Nurse, Vanessa Gosselin, notified supervisory staff, to remove masks from the floors and public areas of the Soldiers' Home in order to conserve resources. Report at 64.

59. During the week of March 7, 2020, the Soldiers' Home department heads began to hold twice-daily meetings to discuss COVID-19. In addition, the Superintendents of the Soldiers' Home including the Chelsea location, were requested to implement new visitation policies and executive teams refraining from attending public events.

60. On March 10, 2020 at the regularly scheduled meeting with the Board of Trustees of the Soldiers' Home, the February 2020 flu outbreak at the Soldiers' Home containment was presented by Mr. Walsh as it had overlapped with the introduction of COVID-19. Mr. Walsh's presentation did not contain any information about COVID-19. However, upon inquiry by trustee Board Chairman Kevin Jourdain, precautionary measures for COVID-19 were also discussed and were similar to those used for the Flu outbreak. Report at 66.

61. On March 19, 2020, Mr. Jourdain sent an email to Mr. Walsh, requesting a weekly update on the COVID-19 situation as just two (2) days previously, the first Veteran tested positive for COVID-19. Mr. Jourdain never received a response from Mr. Walsh. Report at 67.

62. The Report in its investigation of the Soldiers' Home preparation and response to COVID-19 pandemic clearly indicates that the leadership team of the Home, specifically Mr. Walsh, blatantly ignored guidelines proposed by the Commonwealth and federal government that were constantly updated and available as the disease evolved.

E. Failure to Isolate Patients Suspected of COVID-19

63. The Report identified the first veteran to be diagnosed with COVID-19 as "Veteran 1." This veteran demonstrated clear symptoms that he contracted COVID-19 in February 2020. However, he was not tested for the disease until March 17, 2020 which revealed a positive test result on March 21, 2020. Despite Veteran 1 testing positive for COVID-19, he was permitted to remain living among the other veterans and staff. Report at 78-80.

64. Ms. Lauziere consulted with Dr. Clinton whether Veteran 1 should be relocated to the isolation unit that had been set up. Dr. Clinton responded that this was a "moot point" because "everyone has been exposed already." Report at 79.

65. Veteran 1 shared a room with three roommates at the time he tested positive for COVID-19. These three roommates were allowed to roam the common areas freely and interact with other resident Veterans. Neither roommate was tested for COVID-19. According to Dr. Clinton and his understanding of a presentation regarding COVID-19, "if a patient has a roommate with COVID-19, one should automatically assume that patient also has COVID-19." Report at 79.

66. Veteran 1 was never removed to an isolation room, nor was his room properly closed off to prevent the potential spread of COVID-19. The policy requiring his room door to remain closed was ignored for quicker access to Veteran 1 as he was a fall risk and required constant supervision. Report at 81.

9

67. Laundry workers reported that he changed the curtains on 1-North on March 22, 2020, and then proceeded to visit each of the other units for laundry purposes during the following week. This laundry worker tested positive for COVID-19 and demonstrates the lack of protocol and precautions implemented by the leadership team of the soldiers' Home to prevent the spread of COVID-19. Report at 81.

68. A nursing aid concerned with staff being directed to work between positive and negative units interchangeably questioned Ms. Lauziere only to receive a response that the "Home 'had to work with the number of staff they had.'" Report at 82.

69. The Report also indicates that the Soldiers' Home previously moved Veterans to create negative-pressure isolation rooms and then later emptied a hospice unit for use as an isolation space. However, these designated rooms were never used because (1) Dr. Clinton opined Veteran 1 to have already contaminated the whole unit by being allowed to wander freely despite being detected of having COVID-19; and (2) the Home did not have enough staff to provide dedicated personnel to monitor veterans if they were moved to the isolation areas.

70. Furthermore, numerous Veterans were tested throughout March 17 and March 30 for demonstrated symptoms of COVID-19, and were permitted to remain in their units, creating an increase in plausibility for their asymptotic neighbors to contract COVID-19.

F. Discouragement of Use of Personal Protection Equipment

Vanessa Lauziere, Former Chief Nursing Officer.

71. Staff treating Veteran 1 in the days following his test attempted to have Veteran 1 wear a mask but were unsuccessful. The staff caring for Veteran 1 following the days of his test, were not equipped with personal protection equipment and only wore gloves. The staff were than floated from 1-North to other floors in the facility further spreading the disease elsewhere in the building. Report at 80.

72. On March 18, 2020, Ms. Gosselin observed Kevin Ablordeppey wearing personal protective equipment while performing direct care to a patient. At this time, Ms. Gosselin instructed Mr. Ablordeppey about maintaining social distance. Following this interaction, Mr. Ablordeppey then received a disciplinary letter signed by Ms. Lauziere stating the following:

> On this March 18, 2020, during your overnight shift in reaction to    safety procedures of which you disregard, you put on a Personal Protection Equipment without permission or need. Your actions are disruptive, extremely inappropriate and have caused unnecessary resources to be deployed that may be needed in the future. Your behavior unnecessarily

> disrupted and alarmed staff. We expect more from you as a seasoned
> employee of the Soldiers' Home and perceived leader. . .

Report at 86.

73. The disciplinary letter directed to Mr. Ablordeppey indicates that the supplies at the Soldiers' Home was scarce or being reserved for a more severe situation. However, this is contradicted by the actions of Mr. Walsh just one day later on March 19, 2020 when he authorized the transfer of 60 N95 masks to the Soldiers' Home located in Chelsea, which was immediately retrieved by a driver to pick them up in Holyoke. Report at 84.

74. Ms. Lauziere, rather than encouraging medical staff to take proper precautions including protective gear as advised by the CDC and Commonwealth to prevent the spread of COVID-19, chose to discipline staff and discourage them from taking such preventative measures. This act alone, illustrates that the leadership team, including the at the time Chief Nursing Officer herself, Ms. Lauziere, were acting with overt disregard to the reasonable standard of care to patients as they not only ignored, but discouraged, the Soldiers' Home healthcare team from using protective gear and attempted to make access to it impossible by removing it from the floors and locking it away.

## G. The Decision to Combine Two Locked Dementia Units Leads to Devastation

75. According to the Report, on March 27, 2020, was when the worst decision made during the Soldiers' Home's response to COVID-19 occurred. This was the decision made by the Chief Nursing Officer in support of Mr. Walsh, to combine the Home's two locked dementia units despite several of the Veterans in each unit demonstrating or already having been diagnosed with COVID-19. Report at 10.

76. The decision to combine the two locked dementia units was not based on professional standards, standards of reasonable medical care, or to serve the best interest of the Veteran patients residing at the Soldiers' Home. Rather it was a consciousness choice made by leadership roles due to a shortage of staff. According to the Chief Nursing Officer "it didn't matter because the veterans were all exposed anyway and there was not enough staff to cover both units." Report at 11.

77. Combining the two locked dementia units caused twenty-one (21) veterans residing in Unit-2 North to be consolidated into Unit-1 North, exceeding the patient capacity and creating risks of contamination of COVID-19 to Veterans that were asymptomatic or awaiting test results. The merging of the two units was described as staff as "total pandemonium," "when all hell broke loose," "and a nightmare." One staff member stated that she "will never get the images out of my mind—what we did, what was done to those veterans," and "thought my god, where is the respect and dignity for these men?" Report at 11.

78. The two dementia units combined created a scene of disarray as staff members compared the scene to those of concentration camps used in the Holocaust. One command-response leader indicated that the unit had veterans crammed on top of one another with many clearly dying. Report at 11.

79. During the investigation, many staff members indicated that they were unable to keep track of the Veterans as they were hoarded into common areas with their beds only inches apart. All of the Veterans combined into Unit 1-North suffered from dementia and often times would climb in and out of one another's beds. Other staff members recall not being able to locate which Veterans were administered prescriptions, causing many to suffer and/or die without the support of medications and morphine. Report at 90 and 91.

80. The degrading and gross negligent behavior that the leadership team displayed regarding the care of the Veterans is highlighted throughout the process of combining the two dementia units. One social worker, Terri Gustafson who worked at the Soldiers' Home for 21 years reported that she saw Ms. Surreira point to a room and state: "All this room will be dead by tomorrow." Other similar comments made by Ms. Lauziere were noted in the report including "something to the effect that this room will be dead by Sunday so we have more room here." Report at 90 and 91.

81. The choice to consolidate both dementia Units was one that the Soldiers' Home's leadership team executed, despite being fully aware of the repercussions it would manifest, including the widespread of COVID-19 and the veteran lives it would take. This became evident throughout the investigation: "On March 27,2020, a storekeeper employee delivered 13 body bags to 1-North at around 2:45 pm., shortly before the consolidation of the two units began. On March 28, 2020 "a tractor trailer refrigeration unit (ordered earlier in the week) arrived outside the Soldiers' Home to store the remains of veterans who passed away, as there was not enough space in the morgue" to store the bodies of Veterans who has succumbed to COVID-19.  Report at 94.

82. This critical error was made and approved on behalf of numerous individuals composed of the Leadership team including Dr. Clinton, Vanessa Lauziere, Celeste Surreira, and Superintendent Walsh.

83. Mr. Walsh and Ms. Lauziere argue that because of the Soldiers' Home's shortage of staff, they had no choice but to combine the two units. However, within hours of arriving on March 30, 2020, the Commonwealth's emergency response team was able to assess the patients and refer many in need of care to hospitals and other acute-care facilities. The Report notes that this same option was available to Mr. Walsh and his team, but was never elected. Report at 12.

84. Upon their arrival to the Soldiers' Home, the recovery team assembled under Ms. Liptak noted that despite their collective 90-years of nursing, not one of them had ever witnessed a

scene as the one at the Soldiers' Home. "We did not know what patients were in the Home or where they were." In addition, it was noted that the team worked more than 15-hour days trying to "accurately count, asses, and cohort the patients as the existing records were "incomplete" and "disorganized" at best. Report at 111.

85. During the investigation, the 1-North unit was described as a 'war zone," an experience which unfortunately all the men residing there had already lived through, and yet had to endure once more due to the incompetency of the leadership team during this time.

H. Failure of the Leadership Team to Act Amidst a Pandemic.

86. The individuals whom staff, healthcare professionals, and the Veterans themselves, were not only supposed to take instructions and orders from, but would look to for guidance in a scene of chaos and pandemic, also known as the Leadership team, were portraying the exact opposite behavior of what their role, professions, and healthcare standards required.

87. Secretary Urena and Superintendent Walsh were both aware of the consolidation of the two dementia units, despite each unit containing COVID-19 positive residents and many other suspected of having the disease. Neither individual objected or proposed an alternative solution to this decision.

88. On March 25, 2020, members of the leadership team including Mr. Walsh, Ms. Lauziere, Ms. Surreira, and Dr. Clinton attended a call with the Department of Heath epidemiologist Joyce Cohen and Melissa Cumming to discuss staffing issues and COVID-19 Protocols. At no time during this discussion, did either leadership member report inadequate staffing to use isolation areas. While it is noted that Mr. Walsh expressed concern about personal protective equipment and staffing, he did not indicate a need for assistance or "ring any alarm bells." Report at 98.

89. At no time during the March 25, 2020 conversation with the Department of Health, did any individual of the leadership team relate their plan to combine the 1-North and 2-north housing dementia units due to inadequate staffing.

90. According to email conversations that later transpired on March 25, 2020, it was evident that Mr. Walsh was taking satisfaction in his ability to deceive the Department of Health and other officials in his ability to control the COVID-19 situation at the Soldiers' Home. Report at 99.

91. On March 26, 2020, conversations took place via email among staff including leadership members Ms. Lauziere, Mr. Walsh, and Ms. Surreira. The conversation indicated that the only manner to which veterans could be isolated would be by confining them to their room with a mask on using a restraint. This method however, was noted to be "not in keeping with our practice or ethics," by Ms. Lauziere. However, forcing double the capacity

13

allowed of veterans who suffered from dementia, the flu, and showed symptoms of COVID-19 into one unit appeared to be in accordance with their "practice and ethics." Report at 99.

92. Issues concerning lack of communication from Mr. Walsh was expressed to Secretary Urena prior to COVID-19, see line 26, and would prove to be destructive to the Soldiers' Home response to COVID-19. Secretary Urena was unaware that "there was a sense that the place was being overrun" by COVID-19 until Mr. Walsh informed him that he had formally requested the National Guard assistance for staffing at the Soldiers' Home. Report at 100.

93. Despite being informed of the gravity of the COVID-19 situation at the Soldiers' Home, Secretary Urena failed to take initiative and implement steps to conform preventative measures and safety protocols were being enforced at the Soldiers' Home.

94. Lack of action from leadership members at the Soldiers' Home to rectify the COVID-19 situation was not their only error that would impact how COVID-19 affected the Soldiers' home. The leadership team failed to accurately report and keep records of the veterans' healthcare and current COVID-19 statuses. It was not until March 29, 2020 that the Department of Veterans' Services requested daily reporting of the number of pending COVID-19 cases and number of deaths associated with the disease. Report at 126.

95. The leadership team failed to act accordingly prior to, during, and in response to the COVID-19 pandemic and in doing so performed a disservice to the veterans who they had a duty to protect and provide reasonable care to while in their care and custody.

96. After completion of their thorough investigation, the Report states "the Department of Veterans Services failed in its responsibility to oversee the Soldiers' Home." Report at 16.

   I. On April 17, 2020, Stanley Chiz, a veteran resident among many, died of COVID-19 related illness.

97. Stanley Chiz served in the Army as a decorated Corporal in the Korean War. He was honorably discharged in 1948.

98. Stanley Chiz was born and raised in Springfield, MA., and continued to be surrounded by his family consisting his wife Vicky Philips-Chiz, and three sons who all live local.

99. Stanley Chiz, was a veteran resident of the Soldiers' Home since December 28, 2016. He was admitted for long-term care because of progressive dementia and ability to self-medicate and frailty.

100. Prior to his retirement, Stanley Chiz successfully expanded and operated Standard Office Supply for over 25 years. It was a business his father-in-law had started and he proudly took over.

101. Due to Stanley Chiz's living quarters, an apartment located on the second and third floors, he experienced difficulty using a cane and ambulatory. He fell in October of 2015, breaking several ribs and pelvic bones, suffering from a subarachnoid hemorrhage.

102. Stanley Chiz contracted COVID-19 due to the defendants' failure to isolate suspected COVID-19 patients, delay in treating veterans when they were showing symptoms, delay in closing common spaces, failure to stop rotation of staff among units, and inconsistent policies with respect to personal protective equipment. Report at 12-14.

103. On March 31, 2020, Stanley Chiz was swabbed for COVID-19 after displaying symptoms of the disease including becoming severely weak, not able to eat or drink, and development of a fever that was being monitored.

104. On April 2, 2020, the results for his COVID-19 test returned as positive and Stanley Chiz was diagnosed with COVID-19.

105. On April 13, 2020, Stanley Chiz was transferred by ambulance from the Soldiers' Home to Baystate Medical Center located in Springfield, MA, where he was admitted for further treatment of COVID-19.

106. On April 17, 2020, Stanley Chiz died at Baystate Medical Center.

107. Stanley Chiz's death certificate indicates that his cause of death was due to or a consequence of COVID-19.

COUNT 1
FOURTEENTH AMENDMENT
TO THE UNITED STATES CONSTIUTION
42 U.S.C. § 1983

108. The Plaintiff hereby restates and incorporates by reference paragraph numbers 1-105 of this Complaint.

109. The defendants' actions and omissions thereof, were under the color of law.

110. The defendants violated the rights of Stanley Chiz, by failing to provide him with reasonable and minimal medical and health care. The lack of precautions taken rendered Stanley Chiz more vulnerable to harm, including contracting the COVID-19 virus.

111.   The defendants violated the rights of Stanley Chiz, by failing to take proper precautions and preventative measures to ensure the environment Stanley Chiz and other veteran residents resided in was safe and free from unreasonable harm. The COVID-19 guidelines were established for a reason, and it was foreseeable that disregarding these guidelines would result in Stanley Chiz contracting COVID-19.

112.   The defendants' actions and behavior were a substantial breach of the standard of care required of medical treatment and nursing care to be provided within a long-term care facility.

113.   The defendants' acted with deliberate indifference and conscious disregard for veteran resident Stanley Chiz's health, safety, and federal right while residing at the Soldiers' Home by violating the COVID-19 protocols, which resulted in Stanley Chiz contracting the virus.

114.   The defendants undertook a relationship as caretaker of Stanley Chiz by taking responsibility for his care and well-being while a resident of the Soldiers' Home.

115.   The defendants' actions and inactions made Stanley Chiz more vulnerable to contracting COVID-19, which ultimately caused his death.

116.   The defendants' actions and lack thereof constitute behavior that would shock the conscience.

117.   The defendants' violated the Due Process Clause of the Fourteenth Amendment which provides that no State "shall deprive any person of life, liberty, or property without due process of law."

118.   Pursuant to 42 U.S.C. § 1983, the Plaintiff requests recovery to the greatest extent available under the law for the Estate of Stanley Chiz.


WHEREFORE, the Plaintiff, the Estate of Stanley Chiz, demands judgment against the Defendants in the amount of $2,500,000.00 or such amount that this Court shall deem just and proper together with interest and costs and respectfully requests that the Court grant any other relief to which the Plaintiff might be entitled.

**THE PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY ON ALL ISSUES AND FACTS SO TRIABLE.**

Respectfully submitted,
THE PLAINITFF
By her Attorneys:


Dated: 12/22/2020                    _____/s/ Christopher F. Cava_____
                                     Christopher F. Cava, Esquire BBO#: 554437
                                     Jennifer L. Cava-Foreman, Esquire BBO#: 682014
                                     Cava Law Firm
                                     Two Mattoon Street
                                     Springfield, MA  01105
                                     Tel: (413) 737-3430/Fax: (413) 737-3382
                                     Email:  Chris@CavaLawFirm.com
                                             Jennifer@CavaLawFirm.com